

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed January 4, 2007**

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 05-31531-bjh-7 |
| DALE CLAY BULLOUGH, | § | (Chapter 7) |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| BUCKEYE RETIREMENT CO., LLC, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 06-3265 |
| | § | |
| DALE CLAY BULLOUGH, | § | |
| | § | |
| Defendant. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is the complaint (the "Complaint") filed by Plaintiff **BUCKEYE**

**RETIREMENT CO., LLC, LTD.** ("Buckeye") objecting to the discharge of Dale Clay

Bullough (the "Debtor" or the "Defendant") in the above-referenced bankruptcy case (the "Case"). The Court tried the Complaint on December 13-14, 2006. At the conclusion of the trial, the Court took the matter under advisement. The Court's findings of fact and conclusions of law regarding the Complaint are set forth hereinafter.

## FINDINGS OF FACT

1.      This is a core proceeding. *See* 28 U.S.C. §157(b)(2)(J) (2006).

## BACKGROUND

2.      Buckeye is a creditor of the Debtor by virtue of a judgment dated May 17, 2004, in the original amount of $4,625,243.26, of which more than $2.7 million remains due and owing.

3.      On the same day that Buckeye obtained its judgment against the Debtor, Buckeye garnished all of the Debtor's personal bank accounts at Bank of America. The garnishment froze three bank accounts in the name of the Debtor, one called the "personal account," one called the "business account," and a third opened jointly in the name of the Debtor and Kay Brown, the Debtor's personal assistant.

4.      Shortly thereafter, and because his personal accounts had been garnished by Buckeye, the Debtor began paying his personal and household expenses from a checking account in the name of DCB Investment Company, a corporation wholly-owned by the Debtor. The Debtor had signatory authority on the account.

5.      In August 2004, the Debtor began paying his personal and household expenses from two bank accounts in the name of Applied Property Management Company, another corporation wholly-owned by the Debtor. The Debtor had signatory authority on both accounts.

6. Even after the Debtor began paying his personal expenses out of the Applied Property Management Company accounts, the Debtor continued to pay some personal expenses out of the DCB Investment Company account.

7. On February 7, 2005, the Debtor filed a voluntary petition under Chapter 11 of the United States Code, thereby commencing the Case.

8. On March 2, 2005, the Debtor filed his original Statement of Financial Affairs and his original Summary of Schedules and Schedules. The Debtor signed both under penalty of perjury.

9. On April 4, 2005, the Debtor filed his Amended Statement of Financial Affairs and his Amended Summary of Schedules and Amended Schedules. The Debtor signed both under penalty of perjury.

10. On October 10, 2005, the Debtor filed his Second Amended Statement of Financial Affairs and his Second Amended Summary of Schedules and Second Amended Schedules. The Debtor signed both under penalty of perjury.

## FALSE OATHS

11. Relying on 11 U.S.C. § 727(a)(4)(A), Buckeye claims that the Court should deny the Debtor a discharge based on false oaths. Specifically, Buckeye claims that the Debtor made errors and omissions in his original schedules, amended schedules, and second amended schedules, and his original statement of financial affairs ("SOFA"), amended SOFA, and second amended SOFA.

12. Buckeye offered and the Court admitted evidence concerning the following alleged false oaths.

13.     **DCB, Inc. Pension and Profit Sharing Plans.**  In his original Schedule B (Personal Property), under item 11 (retirement accounts), the Debtor listed as an asset a 100% interest in DCB, Inc. Pension and Profit Sharing at an "unknown" value.  In his original Schedule C (Property Claimed as Exempt), the Debtor stated that the value of his interest in these plans was "unknown, if any."  In his amended Schedule B, under item 11, the Debtor again listed the value of his ownership interest in DCB, Inc. Pension and Profit Sharing as "unknown."  No amended Schedule C was filed.  In his second amended Schedule B, under item 11, the Debtor again listed his interest in DCB, Inc. Pension and Profit Sharing at an "unknown" value.  In his second amended Schedule C, the Debtor again stated that the value of his interest in these plans was "unknown, if any." The Debtor offered no explanation of why the value of this asset was either "unknown" or "unknown, if any."

14.     In his Fourth Amended Disclosure Statement (filed January 24, 2006), the Debtor, with the intent to persuade creditors to vote in favor of his proposed plan of reorganization, valued his interest in "the DCB, Inc. Pension Plan and DCB, Inc. Profit Sharing Plan" at "between $200,000 to $300,000."  The Debtor's valuation of the interest at between $200,000 to $300,000 in connection with his attempts to confirm a plan of reorganization juxtaposed against his valuation of the same interest as "unknown" or "unknown, if any" in three sets of schedules raises a question regarding the accuracy of each of the three sets of schedules. By listing the asset as having an "unknown" value, "if any" through late January 2006 without offering any explanation of its potential value, the Debtor minimized the potential significance of this asset and led creditors to believe that further investigation of the asset would be of limited value.

15.    In connection with the Debtor's Rule 2004 examination scheduled for May 5, 2005, Buckeye requested the production of documents regarding the Debtor's interest in pension, profit sharing, or retirement plans.  While the Debtor produced 23 boxes of documents on May 5, 2005, no documents relevant to the pension, profit sharing, or retirement plan request were produced.  And, while the Debtor testified at trial that he thought he produced the documents evidencing the Bullough Family Trust, the DCB, Inc. Pension Plan, and the DCB, Inc. Profit Sharing Plan thirty (30) days or so after his May 5-6, 2005 examination by Buckeye, the Debtor was unable to produce any evidence of his production of those documents in the June/July 2005 time frame other than his oral testimony.

16.    Conversely, Buckeye contends that those documents were not produced until after the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code and the appointment of a trustee for Bullough's estate (the "Trustee").  However, Buckeye offered no evidence to support its contention regarding the timing of the production of these documents either.

17.    On this record it is not completely clear when the documents evidencing the DCB, Inc. Pension Plan and DCB, Inc. Profit Sharing Plan were actually produced.[1]

---

[1] Counsel for Buckeye had an impressive knowledge of the facts of the Case, the Debtor's business operations, and all of the documents upon which she relied at trial.  She clearly did not believe that the pension and profit sharing plan documents were produced until after the conversion of the Case and the Trustee's appointment.  Moreover, on April 29, 2005, Buckeye filed a vague objection to the Debtor's claimed exemptions.  The objection itself admitted that insufficient information was available to support its objection at that time, and indicated that the objection would be supplemented when information became available.  Buckeye never amended or supplemented its objection.  The Debtor ultimately set Buckeye's objection for hearing, and on March 3, 2006, Buckeye withdrew its objection.  These facts, available by the Court taking judicial notice of documents on file in the Case, corroborates Buckeye's contention that the documents were not produced prior to the withdrawal of Buckeye's objection to the Debtor's exemption of these plans.  Buckeye would never have withdrawn its objection if it had seen the underlying plan documents by the time its objection was withdrawn.  Moreover, the Debtor's vague statement that he "thought" he had produced the documents before conversion of the Case is of no real value, without some

However, irrespective of when those documents were produced, they expressly provide that the DCB, Inc. Pension Plan and the DCB, Inc. Profit Sharing Plan terminate upon the dissolution of DCB, Inc., which occurred on April 30, 1980, almost twenty-five (25) years prior to the Debtor's bankruptcy filing. While the Debtor testified that he did not know that the documents provided for the termination of the pension plan and the profit sharing plan upon the dissolution of DCB, Inc., and the Debtor further testified that he consulted a pension attorney as soon as these provisions in the documents were brought to his attention by the Trustee in order to determine whether the plans had in fact terminated back in April, 1980, the Debtor produced no evidence that would show that he had done anything to preserve the exempt status of the assets held in the DCB, Inc. Pension Plan or the DCB, Inc. Profit Sharing Plan upon the dissolution of DCB, Inc.[2]

18. The Debtor's failure to produce the documents evidencing the DCB, Inc. Pension Plan and the DCB, Inc. Profit Sharing Plan when originally requested prevented Buckeye and other creditors from making a legitimate objection to the exemption claim the Debtor made with respect to this property.[3]

19. Further, even if the pension plan and profit sharing plan were still entitled to exempt status notwithstanding the dissolution of DCB, Inc., creditors were entitled to know the potential value of the assets. Assets, whether exempt or not, are material to a bankruptcy case.

---

other evidence to corroborate the earlier production. For these reasons, the Court finds that the Debtor did not produce the plan documents until after conversion of the Case.

[2] The Debtor did testify, however, that the pension attorney he consulted advised him that they have an argument supporting continued exempt status that has never before been litigated.

[3] Equally troubling is the fact that the Debtor now contends that it is too late for anyone, including the Trustee, to object to his claim of exempt status for the DCB, Inc. Pension Plan and the DCB, Inc. Profit Sharing Plan. So, if the Debtor is correct, through his failure to disclose the potential value of this asset at between $200,000 to $300,000, and his failure to produce the documents that provided for the termination of the pension plan and the profit sharing plan upon the dissolution of DCB, Inc., the Debtor may have effectively removed a significant asset from his creditors' reach.

20.     The Debtor testified at trial that his revised valuation of the DCB, Inc. Pension Plan and the DCB, Inc. Profit Sharing Plan in late January 2006 in connection with his Fourth Amended Disclosure Statement occurred as a result of a third-party suggesting a way to minimize the impact of certain restrictions that currently encumber the property upon which those plans hold a second lien.  The Debtor claims that he had not thought of the suggested alternative himself, and the third-party's suggestion was what caused him to conclude that there could be substantial value in the asset held by the plans.  The suggested alternative involves a complicated series of transactions which, to date, have not been able to be accomplished, although several prospective purchasers have attempted them apparently.

21.     The problem the Court has in accepting the Debtor's explanation at trial is that the Debtor failed to offer any explanation of the reasons why the second lien held by the plans was of "unknown" value, "if any."   Because of the complicated nature of his ownership interests in various entities and their related holdings, the Debtor's schedules were full of footnotes and explanations with regard to other assets.  However, with regard to the asset held by the allegedly exempt pension and profit sharing plans, the Debtor offered no explanation of why its value was "unknown, if any."  Then, when the Debtor wanted to attempt to induce creditors to vote for his proposed plan, he revised his valuation to between $200,000 to $300,000, claiming proudly that the offer of the retirement plan "supplement" under his plan of reorganization was value that his creditors would not enjoy in a hypothetical Chapter 7 case for the Debtor.[4]  But, significantly, the

---

[4] The Debtor proposed to share the value of this allegedly exempt asset with his creditors under his proposed Chapter 11 plan.  Accordingly, the asset was to "supplement" other distributions that creditors would receive under the proposed plan.  And, because creditors could not reach this asset in a hypothetical

Debtor failed to mention in his disclosure statement the complicated set of transactions that would have to be combined to make this value realizable.

22.     In January 2006, of course, it was in the Debtor's interest to minimize the problems associated with the potential realization of value because he wanted his creditors to believe he was making "real value" available to them that they would otherwise not be legally entitled to receive.  Conversely, in March and April 2005 when his first two sets of schedules were filed, and in October 2005 when his third set of schedules was filed, it was in the Debtor's interest to be less forthcoming and to minimize the value of the asset held by the plans so that no one would object to his claim of exempt status for his interest in the plans.  The Court finds this lack of candor and the conveniently timed explanations troubling given the complicated nature of the Debtor's business enterprise and his personal holdings.  The circumstances indicate the Debtor knew the oath was false.

23.     **Applied Property Management Company.**  In his original Schedule B (Personal Property), under item 12 (interests in incorporated and unincorporated businesses), the Debtor failed to list his 100% ownership of Applied Property Management Company,[5] an entity awarded to him in the Final Decree of Divorce signed August 19, 2004, in the divorce action styled *In the Matter of the Marriage of Margaret Bullough and Dale Bullough*, Cause No. 01-1524, in the 303rd Judicial District Court of

---

Chapter 7 case because of its allegedly exempt status, the Debtor asserted that his plan satisfied the so-called best interests test of 11 U.S.C. §1129(a)(7).

[5] Under item 33 (other personal property) of Schedule B, the Debtor listed "[r]ights to 'pooled' assets per divorce decree [in] which Debtor may have previously held an interest, *i.e.*, Applied Property Management" at an "unknown" value.

Dallas County, Texas.  In his amended Schedule B, under item 12, the Debtor again failed to list his 100% interest in Applied Property Management Company.[6]

24.    The Debtor's failure to list Applied Property Management Company as an asset was brought to his attention during the continuation of his 2004 examination by Buckeye on August 24, 2005.

25.    More than six weeks after Buckeye raised the Debtor's failure to list Applied Property Management Company as an asset, the Debtor filed his second amended schedules, listing Applied Property Management Company as an asset for the first time.

26.    The Debtor's failure to list his interest in Applied Property Management Company under Schedule B, item 12 (interests in incorporated and unincorporated businesses), in his original schedules and his amended schedules constitutes a false oath.

27.    The circumstances indicate the Debtor knew the oath was false.  Applied Property Management Company had been awarded to the Debtor in the divorce decree signed only six and one-half months prior to the date the Debtor filed his original schedules.  Also, the Debtor listed Applied Property Management Company under item 33 in his original schedules, indicating that he was fully aware of the award of that entity to him in the divorce decree.  Furthermore, as discussed below, in the months immediately preceding the commencement of the Case, the Debtor paid his personal expenses out of two accounts titled in the name of Applied Property Management Company because Buckeye had garnished the Debtor's personal bank accounts.  In addition, Applied Property Management Company served as the general partner of the

---

[6] The Debtor did again list an interest of "unknown" value in Applied Property Management under item 33.

Bullough/Lykos Office Building No. 1, L.P., one of the only assets listed in the Debtor's original schedules as having a significant positive value.

28. These circumstances also indicate the Debtor's reckless indifference in failing to list his interest in Applied Property Management Company, especially, as discussed more fully below, in light of the Debtor's failure to disclose his personal use of Applied Property Management Company's bank accounts in the months that immediately preceded the commencement of the Case. Also, the Debtor failed to correct the omission until after Buckeye raised the issue in his Rule 2004 examination.

29. The omission of his ownership in Applied Property Management Company was material because Applied Property Management Company controlled one of the Debtor's most significant assets by virtue of its position as general partner of the Bullough/Lykos Office Building No. 1, L.P. Also, Applied Property Management Company held title to two bank accounts the Debtor used to pay his personal expenses in the months immediately preceding the commencement of the Case.

30. **Bank Accounts.** In his second amended Schedule B, under item 2, the Debtor, for the first time, listed three Bank of America accounts the Debtor had used to pay his personal expenses in the months immediately preceding the commencement of the Case. The three accounts contained cash in the combined amount of $4,896.96 on the petition date. The Debtor failed to disclose these three accounts in his original and amended schedules, and added them in his second amended schedules only after Buckeye raised the existence of these accounts in the Debtor's 2004 examination. Two of these accounts were titled in the name of Applied Property Management Company. Although titled in the name of Applied Property Management Company, the Debtor maintained an

equitable interest in the accounts as evidenced by his personal use of the funds in those accounts. The third account was titled in the name of the Debtor and Kay Brown, the Debtor's personal assistant.

31.     The Debtor testified at trial that he just made a mistake in failing to disclose his use of the Applied Property Management Company accounts to pay his personal expenses in the months preceding the commencement of the Case, and that he amended his schedules to disclose the existence of these accounts as soon as his mistake was brought to his attention. The Debtor further testified at trial that he did not think he needed to disclose the account he jointly held with Kay Brown because that account had been garnished by Buckeye prepetition, and he did not think there was any money in the account at the time of his bankruptcy filing.

32.     The Debtor's explanations ring hollow, however. Turning first to the Applied Property Management Company accounts, how does one "forget" the accounts one has intentionally diverted income into for months prior to a bankruptcy filing in order to frustrate Buckeye's collection efforts?[7] Moreover, how does one "forget" accounts that one has used to pay personal and household expenses for months prior to the bankruptcy filing? Even understanding the complicated nature of the Debtor's business enterprise and his personal holdings, these two omissions under the circumstances just described should have "jumped out" at the Debtor when he reviewed his first and second sets of schedules before signing them under penalty of perjury. With respect to the

---

[7] Specifically, the Debtor admitted at trial that he caused his consulting fee from The Colony to be made payable to Applied Property Management Company and that he deposited those consulting fees into the Applied Property Management Company accounts. He further testified that he paid his personal and household expenses from those accounts because he needed to live and Buckeye was otherwise garnishing his personal bank accounts. These admissions appear to prove a basis for denial of discharge not pled by Buckeye – i.e., a claim under 11 U.S.C. § 727(a)(2)(A). However, Buckeye did not move to conform the Complaint to the evidence introduced at trial, so the Court will not address this potential claim any further.

account jointly held by the Debtor and Kay Brown, the Debtor's trial explanation makes no sense in light of other disclosures in his original and amended schedules. The Debtor disclosed the other two accounts Buckeye garnished prepetition in all three sets of his schedules, and described them as closed accounts with $0 value on the petition date. Why would you omit the third account because you thought you did not need to disclose it since Buckeye had garnished it and you thought no funds remained when you had already disclosed two similar accounts? The short answer is that this explanation makes no sense in light of the other disclosures contained in the schedules.

33.     Accordingly, the Court finds that the Debtor's failure to list these three bank accounts in his original schedules and his amended schedules constitutes a false oath. The circumstances indicate that the Debtor knew the oath was false because he had been utilizing the two Applied Property Management Company accounts in the months immediately preceding the commencement of the Case and the Kay Brown account was one of the accounts garnished by Buckeye on May 17, 2004. The timing of the Debtor's use of the accounts as compared to the date he filed his original schedules indicates the Debtor's reckless indifference, as does the Debtor's failure to correct the omission until six weeks after Buckeye brought the omission of the accounts to his attention.

34.     The omission of the bank accounts related materially to the Case.

35.     **DCB Investment Company bank account**. In addition to the three bank accounts the Debtor eventually added to his second amended schedules in October 2005, the Debtor failed to disclose in any of his three sets of schedules that he had paid personal expenses out of an account titled in the name of DCB Investment Company. In the month immediately after Buckeye garnished his personal accounts, the Debtor paid his

personal and household expenses out of the DCB Investment Company account. Even after he began using the Applied Property Management Company accounts, the Debtor continued to pay certain personal obligations out of the DCB Investment Company account, including a note payment to the Vial Hamilton law firm of $5,000 per month. The Debtor's continuing use of the DCB Investment Company account to pay personal obligations,[8] coupled with his ability to write checks on the account, and his 100% ownership and control of DCB Investment Company, lead to the conclusion that the Debtor should have listed the account on his schedules. His failure to list the account on his original schedules, amended schedules, and second amended schedules constitutes a false oath. The circumstances of the Debtor's use of the account, including the fact that he made a payment on the Vial Hamilton note with a check written on the account within five days of the commencement of the Case,[9] all indicate that the Debtor knew of the account but failed to disclose it. And, as found previously, the failure to list a bank account in a debtor's schedules is material to his bankruptcy case.

36. **Cobblestone Condominiums.** In Schedule B (Personal Property), also under item 12, the Debtor listed his 100% interest in DCB Investment Company at a value of zero. As explained below, DCB Investment Company owned an 87.5% partnership interest in Mecklenberg/Pineville Associates, L.P. ("M/PA"). In turn, M/PA held a substantial note secured by the Cobblestone Condominiums in Plano, Texas, which

---

[8] While the Debtor testified at trial that the Vial Hamilton note was not a personal expense, the Court concludes otherwise. By his own admission, the Debtor signed a note payable to Vial Hamilton to settle a dispute over legal fees one of his entities owed to the law firm. Once the note was signed, the Debtor became personally liable for the note payments. While the attorneys' fees may not have been his personal obligation initially, they became his personal obligation upon the signing of the note. Moreover, the Debtor admitted his personal liability for this debt on Schedule F, where he listed the law firm as a creditor to whom he owed $30,000 in legal fees.

[9] The payments to Vial Hamilton are disclosed in all three sets of SOFAs. However, the account from which the payments were made was never disclosed in the schedules and should have been.

condominiums had been transferred to CD Associates, Ltd., an entity in which the Debtor owed a 19% limited partnership interest and a 1% general partnership interest through the Debtors' 100% ownership of the sole general partner, Clayco Development, Inc. Despite the substantial equity in the Cobblestone Condominiums, the Debtor listed his interests in DCB Investment Company, CD Associates, Clayco Development, and M/PA at a zero value, meaning that the Debtor omitted any mention of the significant value of the Cobblestone Condominiums from his schedules. In his amended Schedule B, under items 12 and 13, the Debtor again listed his interest in DCB Investment Company, Clayco Development, CD Associates, and M/PA at a combined value of zero.

37. The Debtor admitted that he had undervalued the entities that owned the Cobblestone Condominiums during his Rule 2004 examination taken on May 5, 2005. In his second amended schedules, filed five months later, the Debtor disclosed, for the first time, that his interest in DCB Investment Company had a value of $234,963.72 (on account of its indirect interest in the Cobblestone Condominiums).

38. The Debtor's only explanation at trial for the delay in amending his schedules is the fact that he knew there would be a continuation of his 2004 examination by Buckeye, that more "mistakes" might be brought to his attention during the continuation of his examination, and that he thought it made more sense to just wait until after the examination was concluded to finally amend his schedules and SOFAs. This explanation smacks of a somewhat cavalier attitude toward the Debtor's obligation to fully and completely disclose information in his schedules and SOFAs for the benefit of all creditors (not just Buckeye) and the Court. One could infer from even this explanation that the Debtor wanted to see what other "mistakes" Buckeye caught before

the Debtor fulfilled his obligation to fully and completely disclose his assets and liabilities. Of course, from the Court's perspective, the Debtor has a continuing obligation to review his schedules and SOFAs for omissions or misstatements. Once "mistakes" were brought to the Debtor's attention, he had a duty to not only fix those mistakes but to carefully review all of the schedules and SOFAs again to determine if he had made any more "mistakes" and to fix them on his own. There is no evidence to suggest that the Debtor did either in a timely fashion here.

39. Accordingly, the Debtor's failure to indicate that the Cobblestone Condominiums had a significant positive value constitutes a false oath. The Debtor knew or should have known the value of the asset by virtue of his ownership of 100% of the property's manager, DCB Investment Company, and by virtue of the fact that the Debtor owned the general partner and a limited partnership interest in CD Associates, the asset's owner, and that DCB Investment Company owned 87.5% of M/PA, the entity that held the note on the property. Even after Buckeye raised the issue in his 2004 examination, the Debtor waited five months to correct the value on his schedules. This failure to disclose constitutes a false oath, which was material because it involved a significant asset of the estate.

40. **Income from DCB Investment Company.** During his 2004 examination, the Debtor also admitted that he had failed to report income from DCB Investment Company in his original and amended SOFA. In his second amended SOFA, under item 1, the Debtor for the first time disclosed $128,000 in income from DCB Investment Company in 2004.

41.     At trial, the Debtor testified that this was just another honest "mistake." However, the Court cannot accept this explanation. How do you "forget" at least the source of significant income to you in the year prior to your bankruptcy filing? The Court could better understand a "mistake" in the amount of compensation received from a particular source, but that is not what happened here. There is simply no mention of this income in either the Debtor's original SOFA or his amended SOFA.

42.     The Debtor's omission of $128,000 in income for the year prior to his bankruptcy filing constitutes a false oath. The Debtor had to have known his schedules were incorrect because the income from DCB Investment Company was deposited into his personal accounts (or accounts he used as personal accounts) on a monthly basis and it comprised a significant portion of his 2004 income. For instance, in January of 2004, just one year before the petition date, checks in the amount of $19,000 were written to the Debtor by DCB Investment Company, some of which he signed himself. The amount decreased to $4,500 in November of 2004, but payments were nonetheless made with checks signed by the Debtor. The Debtor's amendment of his SOFA only after Buckeye raised the issue implies fraudulent intent. The omission was material because the amount constituted a large percentage of the Debtor's overall income in 2004, and because the source of the income was a wholly-owned asset of the Debtor.

43.     While Buckeye raised other alleged omissions at trial, they are of less significance by even Buckeye's admission.[10] In light of the Court's prior findings of fact, the Court does not need to address the other alleged omissions.

_____

[10] A possible exception is Buckeye's contention that the Debtor admitted during his 2004 examination that he did not read his amended schedules before signing them. If true, this would be relevant to the Debtor's fraudulent intent. However, after reviewing the relevant testimony, the Court disagrees with the conclusion Buckeye draws from that testimony. Moreover, the Debtor clarified his testimony at trial. In his amended

## FAILURE TO MAINTAIN RECORDS

44.     Relying on 11 U.S.C. § 727(a)(3), Buckeye claims that the Court should deny the Debtor a discharge based on his failure to maintain adequate records.  Buckeye points to a number of instances of the Debtor allegedly failing to keep or preserve adequate financial records from which his financial condition or business transactions could be determined.  The Court finds some of the failures of which Buckeye complains to be of no real consequence.  However, some of the failures of which Buckeye complains are troublesome.

45.     Turning first to examples of inconsequential failures to maintain adequate records, Buckeye complains of inadequate documentation regarding the so-called **Stillwood Condominium**.  The Debtor claimed in his schedules that he and his mother, Nanette Simpson, each owned 50% of this condominium.  That ownership claim was supported, on the one hand, by the fact that the deed was titled in both the Debtor's and Simpson's name.  However, according to Buckeye, other records of the Debtor contradicted the Debtor's claim of 50/50 ownership.  Specifically, Buckeye points to records establishing that the Debtor paid the debt service and homeowner's association dues for the property, treated payments Simpson made as rents on his tax returns, and deducted depreciation on the property for tax purposes.

46.     Ironically, while Buckeye disagrees with the Debtor's characterization of the asset as being jointly owned, it relies upon the Debtor's records to support its dispute

---

schedules, the Debtor bolded and italicized amendments to provide parties with an easier opportunity to understand where changes had been made.  The Debtor testified that he, in fact, reviewed the changes to the documents before he signed them.  The Court is satisfied that the Debtor read his original schedules and SOFA and that he read the changes to them before signing the amended schedules and SOFA.  However, in light of the "mistakes" in the schedules and SOFAs, it would have been more prudent for the Debtor to carefully review *all* of the information contained in the schedules and SOFAs himself when they were first amended, in hopes of finding any other mistakes before Buckeye did and then used those mistakes to attempt to deny the Debtor's discharge.

over ownership. Obviously, there are sufficient records regarding the condominium to allow Buckeye to dispute the Debtor's claim of joint ownership.

47. When asked what documents were "missing" during closing argument, Buckeye's counsel could only identify the lack of a formal written lease agreement between the Debtor and his mother. The Court is not troubled by the absence of a written lease agreement between the Debtor and his mother. While the Court expresses no view here regarding the dispute over the proper characterization of the asset as jointly owned by Bullough and his mother or as individually owned by Bullough, the Court finds that the Debtor maintained adequate records regarding this condominium. In short, the absence of a written lease regarding the Stillwood Condominium had no effect on Buckeye's ability to ascertain the Debtor's financial condition or business transactions.

48. Buckeye next complained of the characterization of ownership of a **house in Corinth** on the Debtor's schedules. The Debtor claimed that he owned legal, but not beneficial, title to the house. According to Buckeye, there was no documentation that would confirm the Debtor's account of the underlying transaction.

49. Significantly, if that is true, the Trustee or a creditor will likely prevail on a claim that this house is property of the estate, for the following reason. The Debtor claims that while he held legal title to the property on the petition date, all of the payments for the property were made by Home & Hearth, Inc., and therefore beneficial title to the property is in Home & Hearth, Inc. If Buckeye, the Trustee, or any other party in interest disputes the Debtor's claim that beneficial title to the property is in Home & Hearth, Inc., given that legal title to the property is in the Debtor's name, the burden of proof will ultimately be on the alleged beneficial owner to prove that it actually made the

payments on the property, thereby establishing its equitable interest in the property. If the alleged beneficial owner cannot produce any documents evidencing its payments, the Debtor's legal title to the property should be dispositive of ownership. Moreover, the absence of these documents under the circumstances of the Case had no real impact on Buckeye's ability to ascertain the Debtor's financial condition or business transactions. Again, Buckeye simply disagrees with the Debtor's characterization of ownership. If necessary, this Court can resolve that dispute at an appropriate time.

50. Next, Buckeye complained that the Debtor could not produce the certificate of title to a **1951 truck**. The Debtor claimed that the truck belonged to Northstar Vineyards, Inc., an entity the Debtor claimed to have sold. At best, this truck was of modest value. Buckeye failed to prove how the absence of the certificate of title from the Debtor's records kept it from ascertaining the Debtor's financial condition or his business transactions. From the Court's perspective, the fact that the Debtor was unable to produce the title to a 54-year old truck is justified under the circumstances of the Case.

51. Buckeye also complains that the Debtor failed to produce **documentation for several entities** in which the Debtor claimed to own an interest. These entities included DCB Enviro-Tech, Inc., H&H Royalty Corporation, Hearthside Employee Opportunity Fund, G.P., Home and Hearth Austin, Inc., Home and Hearth Bossier City, LP, Home and Hearth Houston, Inc., and OW Financial II. According to Buckeye, the only information provided regarding these assets was the Debtor's own testimony.

52. At trial, the Debtor testified that most of these entities conducted no business and, accordingly, he had no documents to produce. Specifically, the Debtor testified that (i) DCB Enviro-Tech, Inc. was formed in 1989, it never conducted any

business operations and was just a shell corporation; (ii) H&H Royalty Corporation was an entity that he thought he had produced some documents for because it was an entity that he and Tom Lykos had intended to use, but never did; (iii) Hearthside Employee Opportunity Fund, G.P. was an entity Lykos formed but no business operations occurred; (iv) Home and Hearth Austin, Inc., Home and Hearth Bossier City, LP, and Home and Hearth Houston, Inc., were each entities that Lykos formed but no business operations occurred; and (v) OW Financial II was an entity of which he owned a modest 5% interest and he had no documents.

53.     Even assuming that the absence of these documents had some impact on Buckeye's ability to ascertain the Debtor's financial condition or business transactions, which is not clear on this record, the Court is satisfied with the Debtor's explanation for his failure to produce documents regarding these entities with the possible exception of H&H Royalty Corporation.  While the Debtor testified that he thought he had produced some documents regarding H&H Royalty Corporation, it is clear that Buckeye is unaware of any documents so produced.  However, in light of the Debtor's unequivocal testimony that no business was conducted by this entity, the Court is satisfied that any failure to produce documents was justified under the circumstances of the Case.  From the Court's perspective, the Debtor satisfactorily explained his failure to keep or preserve documents regarding all of these entities.

54.     Turning to more troublesome omissions, Buckeye complains of the Debtor's failure to keep or preserve adequate records regarding a **condemnation lawsuit** involving the Bullough/Lykos Office Building No. 1, L.P.  The Debtor owned a 69% limited partnership interest in the office building and a 1% general partnership interest in

it by virtue of his 100% ownership of the general partner, Applied Property Management Company.  This office building was one of the few assets identified in the Debtor's schedules as having significant value at the petition date.  Accordingly, the condemnation lawsuit could be material to creditors.  And, while the Debtor claimed to have "worked on" the suit, he never produced any records regarding the status or value of the suit.

55.     Next, Buckeye complains of the Debtor's failure to keep or preserve adequate records regarding an extremely valuable art collection – worth in excess of $1.3 million.  Specifically, the Debtor testified that he maintained a comprehensive **art file** that showed the provenance and circumstances surrounding the acquisition of various valuable pieces of art (mostly paintings) by the Debtor and his wife – *i.e.*, community property until the final decree of divorce divided it in August 2004, and a trust the Debtor established in 1984 for his wife and son – *i.e.*, the Bullough Family Trust.  This art was insured under a combined insurance policy in the name of the Debtor and the Bullough Family Trust, which was provided to the Debtor's creditors as an exhibit to the schedules.  However, the insurance policy schedule did not identify the particular owner of any particular piece of art.  Despite numerous requests for the art file by Buckeye, the Debtor never produced it or any other documents that would confirm the ownership of each piece of art, leaving creditors with no choice but to take the Debtor's word for it.  At trial, the Debtor explained his failure to produce the art file by simply stating that he could not find it.

56.     Buckeye next complains of the Debtor's failure to produce records regarding his alleged assignment of a note receivable due to Northstar Vineyard, Inc. (allegedly representing payment of the purchase price for the sale of Northstar Vineyard,

Inc.). The Debtor claimed that he caused Northstar Vineyard, Inc. to assign the note receivable to a lawyer who had provided legal services to The Plaza at Turtle Creek, an entity in which the Debtor claimed to own a 35% interest. The Debtor listed a 75% ownership interest in Northstar Vineyard, Inc. in his schedules. The Plaza at Turtle Creek is not related to Northstar Vineyard, Inc., except through the Debtor's common ownership. According to Buckeye, the Debtor produced no evidence of the sale of Northstar Vineyard, Inc., or of the **assignment of the Northstar Vineyard note**, other than his own testimony, leaving creditors no ability to determine the nature of the transaction and the reason for it.

57. Next, Buckeye complains of scheduled **shareholder loans** of $2,000,000 from DCB Investment Company to the Debtor. No notes were signed to evidence these loans. The Debtor failed to produce any documentation to substantiate the existence of the loans, the reasons for the loans, the disposition of the proceeds of the loans, or the terms of repayment, except the Debtor's own testimony that the loans were repayable at his convenience.

58. Buckeye also complains of thousands of dollars in **"petty cash"** withdrawals from DCB Investment Company bank accounts and Applied Property Management Company bank accounts. The Debtor produced no documentation to show the reason for the withdrawals, and could not explain the withdrawals at trial, other than to state his general belief that most of the DCB petty cash withdrawals would have been used for legitimate business expenses of one of his many entities. The Debtor admits that the Applied Property Management Company "petty cash" withdrawals were for his

personal expenses, although he could not identify any specific expense paid with those funds at trial.

59.     In addition, Buckeye complains that the Debtor's failure to keep adequate records caused confusion during the administration of the Case.  For example, at the outset of the Case, the Debtor claimed to have a **"consulting agreement"** with an entity known as The Colony (which was awarded to his wife in the final decree of divorce), pursuant to which he earned a consulting fee of $12,500 per month.  The Debtor testified similarly at trial.  However, there is no documentation evidencing this agreement or the duties the Debtor is required to perform under this consulting agreement.  Moreover, on Schedule I, the Debtor claimed employment with Home and Hearth, Inc. at the commencement of the Case, earning a salary of $12,500 per month.  Which is it?  Did the Debtor work for Home and Hearth Inc., drawing a monthly salary of $12,500 during the Case, or did the Debtor have a consulting agreement with The Colony, pursuant to which the Debtor earned consulting fees of $12,500 per month?  Or, did the Debtor really have two sources of income during the Case totaling $25,000, which he failed to disclose accurately on Schedule I?  While the Court doubts it is the latter, the Court remains unclear about the answer to these questions even now.

60.     Finally, the Debtor claimed to have received a **$70,000 commission** for the sale of a parcel of real estate owned by The Colony in July 2004 – seven months before the Case was filed.  The Debtor never produced any documentation of this payment or any paperwork to show why it was made to him.  The lack of any documentation for this transaction seems odd.  If the Debtor earned this money as a commission for the sale of a parcel of real property as he testified, one would expect to

see a closing statement from the title company evidencing the payment of this commission upon the closing of the sale of the real property. Moreover, the Debtor testified during his 2004 examination that the $70,000 was deposited into one of his bank accounts. However, no bank statement produced to Buckeye evidences the deposit of these funds during the time period the Debtor claims to have been paid. Nor did the Debtor identify the account into which the funds were deposited at trial, or produce any evidence of such a deposit. So, even if you accept the Debtor's testimony about his receipt of a $70,000 commission, why are there no documents at all regarding this transaction? What bank account was the money deposited into and where did the money go from there? These questions remain unanswered on this record, other than the Debtor's testimony that the money went into a bank account "somewhere" and was then spent for his personal expenses or the expenses associated with trying to keep his ventures alive.

61. After carefully considering the evidence offered at trial, the Court concludes that the facts found in paragraphs 54-60 establish a pattern of the Debtor failing to keep and preserve adequate records from which his financial condition and/or business transactions can be ascertained. The Debtor's failure to maintain adequate records was not justified under the circumstances of the Case. Although the Debtor produced many boxes of records, sheer bulk does not equate to adequacy. Creditors should not have to sift through piles of documents to ascertain the extent of a debtor's assets, debts, and income. This is especially true given the complexity of the Debtor's business transactions and real estate holdings.

62.    The Debtor is a well-educated, intelligent man with a wide array of business experience. He developed over 39 real estate projects during his business career. In short, the Debtor is an experienced and sophisticated businessman. A debtor of this financial sophistication should be expected to have adequate financial records and should be able to produce them upon request.

## FAILURE TO EXPLAIN DEFICIENCY OF ASSETS

63.    Relying on 11 U.S.C. § 727(a)(5), Buckeye requests that the Court deny the Debtor's discharge based on his failure to explain satisfactorily the loss of assets or why there is a deficiency of assets to meet the Debtor's liabilities considering his income and other assets at his disposal.

64.    As has already been explained, the Debtor received $2,000,000 in shareholder loans within the four years prior to the commencement of the Case. He received $300,000 in income in the year prior to the commencement of the Case, including a lump sum payment of $70,000 from The Colony in July 2004.[11] The Debtor also paid personal expenses out of accounts that belonged to entities wholly-owned by him, but did not include those payments in his statements of income. With one exception

---

[11] In Debtor's counsel's closing argument, counsel argued that the $70,000 was included in the SOFA income of $217,000.00 from Colony Joint Venture for 2004. While that may be true, that is not the issue here. The relevant issue here is where the money went, not the manner in which it was disclosed. Moreover, counsel argued that perhaps the funds were deposited piece-meal into the accounts and that Buckeye's claim that no lump sum payment of $70,000 is found is explained by multiple, smaller deposits. While clever, there are problems with this argument. In short, there is no evidence to support it. Counsel did not even attempt to point to multiple deposits shown on the bank account statements totaling $70,000. Moreover, the Debtor has never testified the commission was paid in installments or that he made multiple deposits of the funds. In fact, the Debtor testified to the contrary during his 2004 examination:

    Q.  Have you produced documents that would show where the deposit of $70,000 went?
    A.  Only in regard to the production of the – all the other documents you've asked for.
    Q.  So if we go and get your bank records, we'll find a deposit for about $70,000 somewhere?
    A.  Somewhere.
    Q.  And that would be in documents that have been produced?
    A.  Correct.
Plaintiff's Ex.9, at p. 55, lines l3-22.

that will be addressed separately below, after pointing to these large sums of money, Buckeye did little more than wonder aloud what happened to it.

65.     In contrast, the Debtor explained at trial what happened to his real estate empire after the terrorist attack of September 11, 2001.  In summary, the Debtor was heavily invested in the hotel industry (indirectly through his various entities), which was severely impacted by the aftermath of September 11.  Money dried up for further development, and the Debtor's various existing business ventures began losing money hand over fist.  Many of his businesses ended up in Chapter 11, with the hope of reorganization, but that hope was largely unrealized.  So, the upshot of the Debtor's testimony was that while he had enjoyed a lavish lifestyle when his businesses were successful, much of the money he made during the period of time preceding his own bankruptcy filing went to attempt to salvage his investments in the various hotel ventures.  Any remaining funds were spent on his personal living expenses.

66.     While the Debtor did make significant amounts of money in the years preceding his bankruptcy filing, his schedules and SOFAs, along with his testimony at trial, indicate that the Debtor generally lived a lifestyle commensurate with his income.  The Court also believes the Debtor when he testified that he was taking funds from one entity to attempt to cover shortfalls in operating income at other entities.

67.     However, the Court is very troubled by the $70,000 real estate commission the Debtor received in July 2004 and the absence of a specific explanation for where that money went.  As noted previously, there is no documentation for this payment to the Debtor.  *See supra* at ¶ 60.   And, while the Debtor testified in his 2004 examination that he deposited the funds into one of his bank accounts, there is no record

of such a deposit in any of the bank statements produced to Buckeye. Accordingly, Buckeye complains about the loss of this specific asset.

68. At trial, Bullough did little more than repeat his earlier 2004 examination testimony. He was paid the $70,000 as a real estate commission for the sale of a piece of real property for The Colony. Although he was unable to identify a specific bank account, the Debtor agrees he previously testified that the money was deposited into one of his bank accounts. And, according to the Debtor, the money was spent just like all of the other money was spent – either to attempt to salvage some of his business ventures or on his personal expenses.

69. The Court finds this explanation unsatisfactory with respect to this specific asset for several reasons. The Debtor should not have been surprised by Buckeye's focus on the "missing" $70,000 commission. Moreover, the Debtor had more than enough opportunity to research the specifics of where that money was deposited, and what items were then paid out of the account into which the money was deposited. But the Debtor did neither. Instead of specifically addressing Buckeye's complaint, the Debtor just repeated his earlier general explanations – *i.e.*, my world was in disarray and I spent the money on either my business ventures or my personal living expenses. That explanation rings hollow with respect to a $70,000 lump sum payment that the Debtor received six months or so before his bankruptcy filing. Accordingly, the Court finds that the Debtor has failed to satisfactorily explain the loss of this $70,000 cash payment.

## CONCLUSIONS OF LAW

70.     As allowed by 11 U.S.C. § 727(c)(1),[12] Buckeye objects to the debtor's discharge under 11 U.S.C. § 727(a), which provides in part:

> The court shall grant the debtor a discharge unless —
>
> * * *
>
> (3)     the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
> (4)     the debtor knowingly and fraudulently, in or in connection with the case —
>
> > (A)     made a false oath or account . . .
>
> (5)     the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . .

11 U.S.C. § 727(a) (2006).

71.     Initially, the plaintiff bears the burden of proving its objection to a debtor's discharge. *See* Fed. R. Bankr. P. 4005.[13]

> The burden of proof is by preponderance of the evidence and it is a 'shifting' burden. Initially it rests with the objecting party. 'Once an objecting creditor establishes a *prima facie* case that one of the grounds for nondischarge under § 727 exists, the burden shifts to the debtor to satisfactorily explain why discharge should be granted.'

---

[12] Subpart (c)(1) provides: "The trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of [11 U.S.C. § 727]." 11 U.S.C. § 727(c)(1) (2006).

[13] Rule 4005 provides: "[a]t the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection." Fed. R. Bank. P. 4005. The Advisory Committee Notes add:

> the rule leaves to courts the formulation of rules governing the shift of the burden of going forward with the evidence in light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector.

*Id.* (Advisory Committee Notes).

*Lindauer v. Traxler (In re Traxler)*, 277 B.R. 699, 703 n.4 (Bankr. E.D.

Tex. 2002) (citations omitted).

## THE DEBTOR MADE FALSE OATHS

72.     A court should deny the debtor a discharge if he makes a false oath.  *See*

11 U.S.C. § 727(a)(4)(A) (2006).  This basis for denying discharge rests on the premise

that

> Full disclosure of assets and liabilities in the schedules required to be filed
> by one seeking relief under Chapter 7 is essential, because the schedules
> serve the important purpose of insuring that adequate information is
> available for the Trustee and creditors without need for investigation to
> determine whether the information provided is true.

*Beaubouef v. Beaubouef*, 966 F.2d 174, 179 (5th Cir. 1992) (internal quotations omitted).

73.     To establish a false oath, Buckeye must show that

(a)     the Debtor made a statement under oath;

(b)     the statement was false;

(c)     the Debtor knew the statement was false;

(d)     the Debtor made the statement with fraudulent intent; and

(e)     the statement related materially to the bankruptcy case.

*Cadle Co. v. Pratt* (*In re Pratt*), 411 F.3d 561, 566 (5th Cir. 2005), *quoting Beaubouef*,

966 F.2d at 178.  False oaths sufficient to justify denial of discharge include (i) a false

statement or omission in the debtor's schedules or statement of financial affairs, or (ii) a

false statement by the debtor at an examination during the course of the bankruptcy

proceedings.  *See Beaubouef*, 966 F.2d at 178.

74.     **The Debtor Signed His Schedules and Statements of Financial Affairs**

**Under Penalty of Perjury.**  As a preliminary matter, a debtor who seeks relief under the

Bankruptcy Code must submit schedules reflecting *all* of the debtor's assets and liabilities, and current income and expenditures. Fed. R. Bankr. P. 1007(b)(1);[14] *see also* 11 U.S.C. § 521(a)(1)(B) (2006).[15] By Rule, the debtor must verify "[a]ll petitions, lists, schedules, statements and amendments thereto" or sign them under "an unsworn declaration as provided in 28 U.S.C.§ 1746."[16] Fed. R. Bankr. P. 1008. When the Debtor signed his schedules, amended schedules, second amended schedules, original SOFA, amended SOFA, and second amended SOFA, he signed each of them "under penalty of perjury," adding that the schedules or statements were "true and correct to the best of [his] knowledge, information, and belief."

75. **The Debtor Made False Statements in His Schedules and Statements of Financial Affairs.** Here, the Debtor's false oaths include outright false statements as well as omissions. The Debtor failed to list as an asset his 100% ownership of Applied Property Management Company. He failed to list four bank accounts on his schedules.

---

[14] Rule 1007 requires

> the debtor . . . [to] file schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases and a statement of financial affairs, prepared as prescribed by the appropriate Official Forms.

Fed. R. Bankr. P. 1007(b)(1).

[15] Under Section 521(a), "[t]he debtor shall — (1) file . . . unless the court orders otherwise — (i) a schedule of assets and liabilities; (ii) a schedule of current income and current expenditures; (iii) a statement of financial affairs . . . ." 11 U.S.C. § 521(a)(1)(B) (2006).

[16] 28 U.S.C. § 1746 provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury.

28 U.S.C. § 1746 (official form omitted).

He misrepresented the value of two assets, and claimed that two assets were exempt, when, in all likelihood, neither was. An omission of information requested in schedules or a SOFA constitutes an affirmatively false statement that the undisclosed information did not exist. *Gebhardt v. Gartner* (*In re Gartner*), 326 B.R. 357, 367 (Bankr. S.D. Tex. 2005). The Debtor also failed to disclose as income payments non-debtor entities made on the Debtor's behalf. Money paid by another person to a third party on a debtor's behalf constitutes income that a debtor should list on his SOFA. *Id*. at 368 (noting debtor's failure to list as income money a colleague paid for debtor's health club membership dues).

76. **The Debtor Knew His Statements Were False.** The circumstances shown at trial indicate that the Debtor knew his statements were false. Among other things, the evidence showed that the Debtor used bank accounts not listed in his schedules up until the moment he filed the Case. The Debtor had to have known that a source of his income in the year prior to his filing was missing from his original and amended SOFA, and that his 2004 income was accordingly understated by a material amount. During the administration of the Case, the Debtor filed pleadings with the Court claiming that assets had value at or near the time that he amended his schedules claiming that the same assets had an "unknown" value, "if any." These circumstances and others indicate the Debtor's knowledge of the falsity of his statements.

77. **The Debtor Made the Statements With Fraudulent Intent.** A reckless indifference to the truth may satisfy the element of intent to deceive sufficient to support a denial of discharge under § 727(a)(4)(A). *General Electric Capital Corp. v. Acosta* (*In re Acosta*), 406 F.3d 367, 372 (5th Cir. 2005); *Beaubouef*, 966 F.2d at 178. A creditor

may prove reckless indifference by circumstantial evidence. *Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382 (5th Cir. 2001), *cert. denied*, 534 U.S. 1042 (2001). Moreover, a debtor's failure to clear up all inconsistencies and omissions when he files amended schedules and the existence of more than one falsehood in them can evidence the debtor's reckless indifference to the truth. *Beaubouef*, 966 F.2d at 178.

78. Here, the Debtor amended his schedules and SOFA once soon after he filed his original schedules and SOFA, but the amended documents contained very few changes. On May 5-6, 2005, Buckeye conducted the initial phase of the Debtor's 2004 examination. In the 2004 examination, Buckeye pointed out inconsistencies and errors in the Debtor's original and amended filings. On August 24, 2005, Buckeye resumed the Debtor's 2004 examination. At that point, the Debtor had not made any further amendments to his schedules and SOFA based on the items raised in the initial part of his 2004 examination. During the second phase of his 2004 examination, Buckeye raised more errors and omissions from the Debtor's original and amended schedules and SOFA. More than six weeks passed after the conclusion of the second phase of the Debtor's 2004 examination before he filed his second amended schedules and SOFA, addressing, for the first time, many of the errors and omissions raised by Buckeye during both phases of the 2004 examination. The Debtor's failure to make required amendments until after Buckeye pointed out errors and omissions implies fraudulent intent. *See Gartner*, 326 B.R. at 371 (noting negative implication raised by debtor's failure to amended filings until after creditor brought errors and omissions to debtor's attention); *see also Sholdra*, 249 F.3d at 383 (noting, as evidence of fraudulent intent, debtor's failure to correct errors and omissions until after creditor raised false statements in debtor's deposition);

*Beaubouef*, 966 F.2d at 178 (discussing debtor's failure to amend filings until after having errors and omissions raised in 2004 examination); *Gartner*, 326 B.R. at 373 (collecting cases).

79.     Even though the Debtor eventually attempted to fix many of the errors and omissions brought to light by Buckeye during his 2004 examination, amendments do not excuse false oaths. *Sholdra*, 249 F.3d at 382.  Moreover, the errors and omissions were on matters that should have been obvious to the Debtor from a careful review of his schedules and SOFAs.

80.     **The Statements Related Materially to the Bankruptcy Case.**  "A false oath is material if it relates to the debtor's business transactions or concerns the discovery of assets or business dealings." *Gartner*, 326 B.R. at 372.  "The status of bank accounts [and] interests in businesses . . . all bear a relationship to the Debtors' estate." *Cadle Co. v. Guenther* (*In re Guenther*), 333 B.R. 759, 768 (Bankr. N.D. Tex. 2005).  Also, a debtor cannot claim that he omitted an asset because it had no value or that his omission would not be detrimental to creditors. *Gartner*, 326 B.R. at 372.  "Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 618 (11th Cir. 1984) (*per curiam*), *quoted with approval in Beaubouef*, 966 F.2d at 178.

81.     In *Gartner*, the court found that the debtor's understatement of his income by $81,000 was material.  *See* 326 B.R. at 373.  Here, the Debtor similarly understated his income for 2004 by (at least) $128,000.

82.     The Debtor also omitted several bank accounts from his original and amended schedules.  "Few, if any, assets are more material to a consumer debtor's

financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the detail of the debtor's finances." *Johnson v. Baldridge* (*In re Baldridge*), 256 B.R. 284, 290 (Bankr. E.D. Ark. 2000), *quoted with approval in Cadle Co. v. Pratt* (*In re Pratt*), 411 F.3d 561, 567 (5th Cir. 2005). Even though some of the bank accounts omitted from his schedules and SOFA may have had little or no money in them, a debtor cannot escape the consequences of § 727(a)(4)(A) by asserting that the omitted information involved a worthless asset. *See Pratt*, 411 F.3d at 566-67.

83. After carefully considering the record as a whole, the Court is satisfied that the errors and omissions in the Debtor's schedules and SOFAs related materially to the Case.

84. For all of these reasons, the Court concludes that Buckeye has established each of the elements of its claim under § 727(a)(4)(A) of the Bankruptcy Code by a preponderance of the evidence. Accordingly, the Debtor's discharge must be denied in accordance with § 727(a)(4)(A) of the Bankruptcy Code.

## THE DEBTOR FAILED TO KEEP ADEQUATE RECORDS

85. "Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands." *WTHW Inv. Builders v. Dias* (*In re Dias*), 95 B.R. 419, 422 (Bankr. N.D. Tex. 1988). In short, § 727(a)(3) ensures that a debtor maintains records that will enable a trustee and creditors to examine the debtor's financial condition and determine what has passed through the debtor's hands. *See Guenther*, 333 B.R. at 765. Creditors

should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information. *Id.*

86.     "Creditors are entitled to written evidence of the debtor's financial situation and past transactions; maintenance of such records is a prerequisite to a discharge." *Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 856 (Bankr. N.D. Tex. 2003), *aff'd*, 299 B.R. 810 (N.D. Tex. 2003). The adequacy of a debtor's records must be established on a case by case basis. *Id.* The Court has wide discretion in determining whether a debtor has produced sufficient records. *See id.*

87.     A creditor objecting to discharge under § 727(a)(3) must make out a *prima facie* case that the debtor (i) failed to maintain and preserve adequate records, and (ii) such failure makes it impossible to ascertain his financial condition and material business transactions. *Gartner*, 326 B.R. at 375. In a case based on § 727(a)(3), the creditor does not have to show intent or recklessness. *Id.*; *see also In re Jones*, 327 B.R. 297, 303 (Bankr. S.D. Tex. 2005). Even negligence will suffice to justify a discharge under § 727(a)(3). *Jones*, 327 B.R. at 303.

88.     The standard for disclosure of records for a sophisticated debtor is higher than that of an unsophisticated debtor. *Gartner*, 326 B.R. at 375. Here, the Court has found the Debtor to be a well-educated and sophisticated businessman. "Debtors who engage in sophisticated business practices and who have attained a high level of education are held to a higher standard because they should be more aware of the importance of maintaining and producing important financial records." *Id.*

89.     When a debtor owns or controls closely-held entities, the debtor's failure to keep adequate records for such entities, as well as the debtor's business dealings with

such entities, may constitute a violation of § 727(a)(3).  *See Womble*, 289 B.R. at 857.
The fact that the Debtor transacts business with one or more small closely-held entities is
no defense to the requirement that debtors keep adequate records.  *Id*. at 858-59.

90.     In *Womble*, the Court denied the debtor's discharge based on
circumstances relevant here.  Womble, like the Debtor here, made no effort to document
the purpose of inter-company loans or "loans" he claims his entities made to him.  The
court found the failure to document such transactions a violation of § 727(a)(3).  *See id*.
at 859.

91.     *Womble* relies heavily on *Union Planters Bank, N.A. v. Connors*, 283 F.3d
896 (7th Cir. 2002), a case in which the debtors borrowed, lent, transferred, and spent
extremely large sums of money to keep their businesses afloat.  The court denied the
discharge after the debtors produced bank account statements and cancelled checks that
failed to provide sufficient information to trace their financial history or reconstruct their
transactions.  Likewise, relying on *In re Juzwiak*, 89 F.3d 424 (7th Cir. 1996), the *Womble*
court recognized that a debtor cannot satisfy his burden to keep adequate records by
merely producing bank statements if those bank statements fail to adequately identify the
source of deposits or the reasons for payment.  Particularly apt in this case is the *Womble*
court's statement that financial records are inadequate under § 727(a)(3) "when the
debtor pays personal expenses out of business accounts, or when the debtor pays business
expenses out of a personal account, or when the debtor pays one entity's expenses out of
an account belonging to a different entity."  *Womble*, 289 B.R. at 858.  "When such a
debtor's records lead to a 'confusion of assets' between the debtor and his entities, or

when the corporate records of the debtor's entities are missing, the debtor has failed to maintain adequate records as mandated by [S]ection 727(a)(3)." *Id.*

92. Once a plaintiff establishes a *prima facie* case under subsection (a)(3), the burden shifts to the debtor to "establish that his failure to keep adequate records was justified under all circumstances." *Gartner*, 326 B.R. at 376. The debtor may satisfy his burden by showing either a lack of sophistication or that the neglected records were not in any way needed to ascertain his financial condition. *Id.*

93. In *Womble*, confronted with undocumented inter-company loans and other transactions typical of the Debtor's transactions here, the court concluded that the debtor had presented the court with "spaghetti -- numerous transactions going in all directions, all intertwined between Womble [and his entities] with no meaningful paper trail, and with nothing more than Womble's after-the-fact explanation of what any particular transaction or transfer represented." *Womble*, 289 B.R. at 859. The Debtor's transactions in this case strike a remarkable resemblance to those examined in *Womble*. And, "[t]he [Bankruptcy] Code demands more of a debtor" under these circumstances. *Id.*

94. After carefully considering the record as a whole, the Court concludes that Buckeye has established each of the elements of its claim under § 727(a)(3) of the Bankruptcy Code by a preponderance of the evidence. The Debtor failed to keep or preserve adequate financial records from which his financial condition or business transactions might be ascertained. And, the Debtor did not justify his failure under all of the circumstances of the Case. Accordingly, the Debtor's discharge must be denied in accordance with § 727(a)(3) of the Bankruptcy Code.

## THE DEBTOR FAILED TO EXPLAIN
## SATISFACTORILY HIS LOSS OF ASSETS

95.     Section 727(a)(5) allows a court to deny a debtor's discharge where he fails to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities.  "A lack of detailed information as to the debtor's affairs prejudices creditors by making it difficult for the trustee to administer the estate and recover assets that may otherwise be recoverable for the benefit of creditors."  *McVay v. Phouminh* (*In re Phouminh*), 339 B.R. 231, 247 (Bankr. D. Colo. 2005).  As important, "a lack of transparency creates a cloud of doubt as to the true nature of the debtor's pre-petition activities."  *Id*.  Thus, "[w]here the ability to maintain records and explain the loss of assets is fully within the debtor's control, it would be inequitable to grant a discharge to an individual who, by his . . . own action, with or without fraudulent intent, has made it impossible to administer the estate or determine where the debtor's assets have gone."  *Id.*

96.     Once a party objecting to discharge meets its initial burden to show a loss of assets, the burden shifts to the debtor to explain the loss or deficiency.  *Id*. at 247-48, *quoting Cadle Co. v. Stewart* (*In re Stewart*), 263 B.R. 608, 618 (B.A.P.10[th] Cir. 2001).  If the debtor's explanation is not credible, the court should deny the discharge.  *See Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 598 (Bankr. N.D. Tex. 1991) (denying discharge for debtor who testified in vague generalities, answered "I don't know" to most questions about the loss of his assets, and gave no details of transactions).  The debtor's explanation must be specific and corroborated.  *Phouminh*, 339 B.R. at 248.

97.     Here, the Debtor failed to provide specific and corroborated evidence to show where the $70,000 real estate commission he received just months before his

bankruptcy filing went. This justifies the denial of the Debtor's discharge in accordance with § 727(a)(5) of the Bankruptcy Code.

## CONCLUSION

98.     The Debtor has not supplied the Court with the kind of transparent look at his pre-bankruptcy life that justifies a discharge. The Debtor omitted and misrepresented significant assets in his schedules and SOFAs that should have been obvious to him from a careful review of those documents. The Debtor amended them eventually, but only after Buckeye had the task of sifting through box after box of documents and raising the omissions and errors in a three-day long 2004 examination. Even then, for many transactions, the creditors have no documentation and only the Debtor's uncorroborated explanation for what happened and why. At some point, errors and omissions in schedules and SOFAs leave the realm of honest mistakes and enter the realm of purposeful deceit or, at the very least, reckless indifference to the truth.

99.     The Court recognizes that the Debtor, certain persons who work for the Debtor, and his counsel expended significant effort in preparing the Debtor's schedules and SOFAs in the Case. Moreover, the Court recognizes the difficulty of preparing "perfect" schedules and SOFAs for a debtor whose business interests are as far reaching and complex as the Debtor's were here. Finally, there is no evidence to suggest, and the Court does not believe, that the Debtor sat down and thought – "what can I try to sneak by the Court and my creditors in my bankruptcy case?" The Debtor is far too smart for that. The Debtor also knew of Buckeye's reputation for dogged pursuit of debtors in bankruptcy cases and, accordingly, he knew that Buckeye would be combing through his records and his financial and other disclosures in the Case very, very carefully.

100.    Under these circumstances, one would have expected the Debtor to exercise extreme care in the preparation of his schedules and SOFAs.  However, notwithstanding this, and the obvious effort that went into preparing the Debtor's schedules and SOFAs, the Debtor omitted some significant information from his original and amended schedules and SOFAs.  And, as noted previously, the omitted information is of a type that should have been easily recognized by the Debtor when he carefully reviewed his schedules and SOFAs before signing them under penalty of perjury.

101.    The Debtor's discharge shall be denied under 11 U.S.C. § 727(a)(3) because the Debtor failed to maintain and preserve adequate records and such failure made it impossible to ascertain his financial condition and material business transactions. The Debtor failed to establish that his failure to keep adequate records was justified under all the circumstances of the Case.

102.    The Debtor's discharge shall be denied under 11 U.S.C. § 727(a)(4) because the errors and omissions in the Debtor's schedules, amended schedules, second amended schedules, SOFA, amended SOFA, and second amended SOFA constitute false oaths of the Debtor.  They were made at a time when he knew or should have known that they were false.  They were made with reckless indifference for the truth regarding issues material to the Case.

103.    The Debtor's discharge shall be denied under 11 U.S.C. § 727(a)(5) because the Debtor failed to explain satisfactorily the loss of an asset.

104.    Any finding of fact that is determined to be a conclusion of law shall be deemed to be a conclusion of law, and any conclusion of law that is determined to be a finding of fact shall be deemed to be a finding of fact.

105.    A judgment consistent with these findings of fact and conclusions of law shall be entered separately.

### End of Document ###